IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 08-cv-01119-MSK-KLM

TONY'S TAPS, LLC, d/b/a PAGOSA BREWING COMPANY, INC., a Colorado
corporation,

      Plaintiff,

v.

PS ENTERPRISES, INC., d/b/a PAGOSA PUB BREWPUB,
FRANK SCHIRO, and
ROBIN SCHIRO,

      Defendants,

and

PS ENTERPRISES, INC., d/b/a PAGOSA PUB BREWPUB,

      Counterclaimant/Crossclaim Plaintiff,

v.

TONY'S TAPS, LLC, d/b/a PAGOSA BREWING COMPANY, INC., a Colorado
corporation,

      Counterclaim Defendant, and

RICHARD ANTHONY SIMMONS, a/k/a Tony Simmons,

      Crossclaim Defendant.

_____

ORDER ON MOTIONS TO REOPEN, TO AMEND
JUDGMENT, AND FOR INJUNCTIVE RELIEF
_____

**THIS MATTER** comes before the Court pursuant to Plaintiff's Motion for Order to Re-

open Case (**#219**); Plaintiff's Motion to Alter or Amend Judgment, [etc.] (**#220**), and the

1

Defendants' response **(# 224)**; and the Plaintiff's Motion for Permanent Injunction (#**221**), and the Defendants' response **(# 225)**.  The Plaintiff filed a consolidated reply **(# 227)** in support of all of its motions.

## FACTS

The Court will elaborate on the specific relevant facts as appropriate in its analysis, but in general summary, the Plaintiff, doing business under the mark "Pagosa Brewing Company," filed this action against the Defendants, who do business using the mark "Pagosa Pub Works Brewpub," alleging trademark infringement and false advertising under the Lanham Act.  The Plaintiff's claims were tried to a jury in May 2011.  The jury returned a verdict in favor of the Plaintiff on both claims, but awarded damages of only $ 82.

Although the Court inquired after return of the verdict whether the parties had any additional matters to take up, the Plaintiff did not request additional injunctive relief at the conclusion of trial, nor during the two-week period thereafter.  Thus, on May 20, 2011, the Court entered judgment in accordance with the jury's verdict and issued an Opinion and Order **(# 217)** denying costs on the grounds that the Plaintiff accomplished nothing more than a "nominal" recovery.

The Plaintiff then filed the instant motions.  The Motion to Reopen Case **(# 219)** is simply procedural in nature, requesting that the Court reopen the case to permit the Plaintiff to file the remaining motions.  The Motion to Alter Judgment, [etc.] **(# 220)** seeks several items of relief: (i) leave to file a bill of costs; (ii) leave to file a motion for permanent injunction; (iii) leave to file a motion for attorney's fees; and (iv) the setting of a deadline by which such motions would be filed.  Finally, the Plaintiff moves for entry of a permanent injunction **(# 221)**

2

barring the Defendants from using "any name incorporating the word 'Pagosa' . . . and

'Brewpub' or 'Brewery' . . . where such name in its entirety would be likely to cause confusion."

## ANALYSIS

### A.  Motion for Permanent Injunction

Although the Motion to Alter Judgment, [etc.] seeks leave to file a motion for permanent

injunction, the Plaintiff thereafter filed a standalone motion specifically seeking injunctive relief.

 Thus, the Court assumes that the Plaintiff has been fully heard on the substantive request for a

permanent injunction.

### 1.  Waiver

Before the Court can turn to the substantive question of whether an injunction is

warranted, it must first deal with the question of whether the Plaintiff has waived the opportunity

to request injunctive relief.  After the Court received the verdict and discharged the jury, it

inquired whether the parties had "any issues you want to raise at this time."  The Plaintiff's

counsel responded:

> I have no specific issues.  I would just like to discuss the follow-up
> regarding a bill of costs and our motion for attorney – file for
> attorney's fees.  I assume that will be addressed in a court order. . .
>
> It's not truly an issue.  It's just a matter of housekeeping.  With
> regard to our claim for attorneys fees and addressing a bill of costs
> with regard to our claim in this case and I assume it will be
> addressed in a court order.  We can then file a formal motion and
> proceed in that manner.

The Court responded that "the provisions for an award of costs are specified in the rules.  A

request for attorney's fees is specified in the applicable law."[1]  The Defendants' counsel then inquired whether the parties "work together to do a final journal entry of judgment," to which the Court responded that "No, we will issue a judgment."  The Court then recessed.

Although the Plaintiff gave no indication that it intended to file any other motions prior to entry of judgment, the Court nevertheless refrained from entering judgment for a period of 14 days in order to allow the Plaintiff sufficient time to make any written motions that might bear on the judgment to be entered.  No such motions were filed.  Thus, on May 20, 2011, consistent with the requirement of Fed. R. Civ. P. 54(d)(1), the Court entered judgment.

In its motion seeking leave to file a request for injunctive relief, the Plaintiff points that it had consistently maintained its request for injunctive relief in its various pleadings and pretrial filings in this case, up to and including the Final Pretrial Order.  The Plaintiff  "expected that any necessary motion for permanent injunction would also be filed [after the Court entered judgment] if the Court had not already addressed that issue under the appropriate standards in its judgment, as it clearly could have (and should have) done."[2]  The Plaintiff argues that "the Court

---

[1]*See* D.C. Colo. L. Civ. R. 54.1 (bill of costs must be filed within 14 days after entry of judgment); Fed. R. Civ. P. 54(b)(2)(B) (motion for attorney's fees must be filed within 14 days after entry of judgment).

[2]The argument that the Court "should have" awarded injunctive relief to the Plaintiff in the judgment stems, in part, from the Plaintiff's argument that Fed. R. Civ. P. 54(c) obligates the Court to award the Plaintiff all relief that could conceivably be obtained as a result of the verdict, regardless of whether the Plaintiff affirmatively requested it.  Rule 54(c) states that a judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."  The purpose of Rule 54(c) is to abolish the "antiquated and rigid forms" of the "theory-of-the-pleadings doctrine" that "held that plaintiff could not recover anything other than the relief specifically requested in the ad damnum clause of the complaint"; the rule reflects the objective that the relief "requested and ultimately awarded will be based on what was proved rather than on what was pleaded."  Wright & Miller, *et al.,* Federal Practice and Procedure, Civil § 2662 (3d Ed.)  The Plaintiff offers no citation for its interpretation that Rule

cites no order, no rule and no practice standard which would give any rational significance to [an] arbitrary two-week post-verdict, pre-judgment period."

Although no statute or rule expressly indicates when a request for permanent injunctive relief should be raised, Fed. R.Civ. P. 58(b) directs the Court to promptly enter judgment when there is a special verdict or general verdict with answers to written questions. The jury's verdict triggered the obligation to enter judgment. The Court's inquiry of counsel after receipt of the verdict provided the parties with the opportunity to identify unresolved issues that affected both the substance and  the timing of entry of judgment - such as continuing request for injunctive relief. Neither party signaled the need to resolve any issue other than an award of costs or attorney fees. The Plaintiff's assumption that the Court would canvass its pleadings, determine what items of relief it had requested and how those correlated with the jury's verdict, and then fashion a judgment including a permanent injunction without request or guidance by the parties is unreasonable and would exceed the neutral role of a court.  The onus was on the Plaintiff to request the relief desired upon the return of the jury's verdict, or to request delay in entry of judgment to allow it to consider options and advise the Court of its position.

In this regard, *Alexander v. Riga*, 208 F.3d 419 (3d Cir. 2000), is instructive.  There, plaintiffs asserted claims that the defendants discriminated against them on the basis of race in refusing to rent apartments.  The plaintiffs' complaint sought both monetary damages and injunctive relief.  The case proceeded to trial, and the jury returned a verdict finding that the

---

54(c) compels the Court to award relief that a party has mentioned in its pleadings but not sought through a timely request, and indeed, courts and commentators have acknowledged that the rule does not direct courts to "force" a certain item of relief upon a party who has not expressed a desire for it.  *Id.*, citing *International Nikoh Corp. v. H.K. Porter Co,*, 358 F.2d 284, 290 (6th Cir. 1966).

defendant had discriminated against the plaintiffs, but the jury refused to award any monetary damages.  As a result of the verdict, the trial court entered judgment in favor of the defendant.[3]  Two days after the judgment entered, the plaintiffs filed a motion seeking injunctive relief.  The trial court denied the request, finding that the plaintiffs had "waived" the opportunity to request such relief.  It noted that a request for injunctive relief "had been a significant portion of the complaint and pretrial statement," but that the plaintiffs "had not repeated the request until six days after the jury trial [had concluded]."  *Id.* at 434.  The Court of Appeals affirmed the finding of waiver, agreeing that "six days elapsed from the time the jury's verdicts were returned and the jury was discharged until the plaintiffs requested a hearing on injunctive relief."  *Id*.  It also agreed with the trial court that the plaintiffs had "requested this relief in their complaint and pretrial statements," but that "at no time during the pretrial conferences with the court, or during the trial itself, did plaintiffs' attorneys refer to their requests for injunctive and equitable relief." [4]

_____

[3]The appeals court found that, notwithstanding the lack of a monetary award, the entry of judgment in favor of the defendant instead of the plaintiff was error.

[4]One aspect of *Alexander* warrants further examination here.  The *Alexander* court found that the plaintiffs had raised a demand for injunctive relief "in their complaint and pretrial statements" but had not raised that demand "during the pretrial conferences with the court."  Cases that have cited *Alexander* have often seized upon the latter phrase, deciding the waiver issue based on whether or not the plaintiff had formally included a request for injunctive relief in the pretrial order.  *See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 2008 WL 269451 D. Colo. Jan. 29, 2008) (slip op.) *and cases cited therein*.

This Court does not read *Alexander* to stand merely for the simple proposition that "waiver occurs if (and perhaps only if) the request for injunctive relief is not included in the pretrial order."  *Alexander* makes clear that the plaintiffs there included demands for relief in their "pretrial statements," but did not reassert those demands in "pretrial conferences."  It is not clear to this Court whether *Alexander* is purporting to require plaintiffs to orally invoke a demand for injunctive relief during a pretrial conference in order to preserve a written request for such relief in the pretrial order, or whether local procedural customs or differences in terminology are obscuring the case's teaching.  However, a reading of *Alexander* as offering a bright-line rule that omission of a demand for injunctive relief in a pretrial order constitutes

*Id.* Thus, it agreed with the trial court that "the issue is waived by the failure of counsel to raise the issue of injunctive relief prior to the conclusion of trial."  *Id.*

The requirement that a party renew its request for injunctive relief following the return of the verdict is particularly well-illustrated by cases such as *Alexander* and this case.  Plaintiffs filing an action or gearing up for trial may be hopeful of a clear and decisive victory; pre-trial enthusiasm and strategy may encourage a plaintiff to seek the broadest possible relief should the jury rule in their favor.  But such enthusiasm can dissipate rapidly when the jury returns a verdict that is little more than a technical victory for a plaintiff. A plaintiff who has spent huge sums of money and time, only to be rewarded with merely a nominal verdict in its favor, might very well conclude that post-verdict proceedings to secure injunctive relief are no longer worth the additional time and expense that will be required.  Or a plaintiff might recognize that its less-than-resounding victory could adversely affect its ability to establish the elements necessary to obtain injunctive relief, leading it to conclude that abandoning its request for injunctive relief is the wiser course of action.

Put simply, a jury verdict, especially one that returns little to a plaintiff is a cause for reassessment of the plaintiff's legal position.  A court cannot assume that, simply because a plaintiff's pre-trial demands included a request for permanent injunctive relief, that the plaintiff persists in such demand.  *Alexander* teaches that post-verdict demand should be made promptly,

---

waiver would not explain that court's additional observations that "six days elapsed" between the release of the jury and the plaintiffs' motion seeking injunctive relief; the post-verdict passage of time would be irrelevant if the analysis exclusively focused on the contents of the pretrial order.  Thus, *Alexander* must be read to establish that the waiver question is informed both by the extent to which requests for injunctive relief are asserted and re-asserted <u>prior</u> to trial, as well as by the timeliness of the plaintiff's <u>post-verdict</u> requests for such relief.

not delayed until after judgment has already been entered.  This is especially so when the Court inquires of counsel as to matters requiring a delay in entry of judgment.

Nevertheless, the Court understands the Plaintiff's argument to be that it did not "intentionally" waive the right to request a permanent injunction, because it did not understand that it needed to make such request after the verdict was received.  Accepting the argument as a statement of fact, the Court  finds that although the Plaintiff may have relinquished its opportunity to seek post-verdict relief, it did so through carelessness or inexperience, not with an intent to abandon that right.   Accordingly, notwithstanding cases like *Alexander*, the Court concludes that the Plaintiff did not intentionally waive its right to seek injunctive relief.

2.  Merits

Finding no waiver of Plaintiff's request for an injunction, the Court turns to Plaintiff's motion. In exercise of its equitable discretion, the Court finds that entry of a permanent injunction as requested by the Plaintiff is not appropriate in the particular circumstances of this case.

The Lanham Act contemplates that injunctive relief may be awarded upon a finding of trademark infringement,[5] 15 U.S.C. § 1116,  but such relief is not automatically or reflexively granted.[6]  A plaintiff demonstrating trademark infringement must still show that permanent

---

[5]The Plaintiff's Lanham Act false advertising claim alleged that the Plaintiff was harmed by the Defendants falsely claiming to be a "brewpub," even though they did not actually brew their own beer on premises.  The jury found in favor of the Plaintiff on this claim, but such success cannot give rise to prospective injunctive relief because it is undisputed that the Defendants have since begun brewing their own beer, and thus, are no longer falsely advertising their business.

[6]The Plaintiff cites *SunAmerica Corp. v. Sun Life Assurance Co.*, 77 F.3d 1325, 1336 (11th Cir. 1996), for the proposition that "complete injunctions against the infringing party are

injunctive relief is appropriate under general equity principles.  This requires a demonstration that: (i) it has suffered or will suffer an irreparable injury; (ii) it lacks an adequate remedy at law; (iii) the balance of the hardships as between the parties favors injunctive  relief; and (iv) the public interest is not averse to an injunction.  *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008).   Even if appropriate, the particular injunctive relief "should be narrowly tailored to fit specific legal violations." *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011).  Indeed, the Lanham Act does not require imposition of a complete ban on the use of a mark by an infringing user; instead, it requires that the court balance the equities to reach an appropriate result protective of the interests of both parties.  *Id.*, *citing Stering Drug, Inc. v. Bayer, AG*, 14 F.3d 733, 750 (2d Cir. 1994).  In exercising its equitable powers, the Court is bound by the jury's factual findings as reflected in the verdict.  *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 42-43 (1st Cir. 2006).

1. Irreparable injury

With regard to the first factor – irreparable injury – the Plaintiff argues that irreparable harm "can be presumed upon likelihood of confusion being shown," *Amoco Oil Co. v. Rainbow Snow, Inc.*, 809 F.2d 656, 663 (10th Cir. 1987).  It argues that the jury's verdict expressly

---

the order of the day" in trademark infringement actions.  Although *SunAmerica* contains this quotation (in *dicta*), that notion has been called into serious question by subsequent caselaw.  In *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 393-94 (2006), the Supreme Court rejected "general rule[s]" or presumptions dictating that "a permanent injunction will issue once infringement [has been found]".  Instead the Court directs that trial courts must exercise their equitable discretion consistent with the facts of a given case.  Although *eBay* was a patent infringement case, the court in *North American Medical Corp. v. Axiom Worldwide, Inc*., 522 F.3d 1211, 1227-28 (11th Cir. 2008), persuasively explains that its result should be equally applicable in cases under the Lanham Act, and that courts should eschew "applying categorical rules to the grant or denial of injunctive relief."

concluded that the similarity between the Plaintiff's and Defendants' marks were likely to cause confusion, therefore irreparable injury is presumed.

As explained in note 5 above, recent Supreme Court precedent calls into doubt the reflexive imposition of a permanent injunction, simply because infringement has occurred.  This caution logically should apply equally to the presumption that because there is a "likelihood of confusion" between marks, that such confusion will result in future irreparable harm. Thus, cases standing for the proposition that "irreparable harm is presumed from defendant's infringement of the plaintiff's mark" are now open to some question.  *See e.g. DaimlerChrysler v. The Net, Inc.*, 388 F.3d 201, 208 (6th Cir. 2004); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 938-39 (4th Cir. 1995).

The Court finds that the better course of action is to avoid imposition of a prospective injunction based solely on  "presumptions" and instead to examine whether the circumstances of the case indicate a likelihood of future irreparable injury – *i.e.* the plaintiff's loss of control of reputation, loss of trade, and loss of goodwill.  *See e.g. Gucci America, Inc. v. Daffy's, Inc.*, 354 F.3d 228, 237 (3d Cir. 2003) (defining components of irreparable injury).  Here, the focus is upon the evidence at trial that suggested that the Defendants' continuing use of their mark will result in the Plaintiff's loss of reputation, trade, or goodwill.

At trial, there was evidence that customers seeking to patronize the Plaintiff's business mistakenly went to the Defendants' location instead, and vice-versa.  However, careful examination of the record suggests that the confusion between the businesses was due primarily to factors other than similarities in the parties' <u>marks</u>.

Both businesses are located in a small town. One significant reason that customers

10

intending to patronize the Plaintiff's business instead wound up patronizing the Defendant's business had to do with the proximity and location of the businesses.  The businesses are located directly across the street from each other.  However, when the Defendants opened their business, the Plaintiff's business had no ingress or egress directly to or from the common street. As demonstrated in Exhibit 37, Plaintiff's business was located on a parcel of land that surrounded by other parcels without direct access to North Pagosa Blvd., the major thoroughfare.[7]  In addition, during this initial period of competition, the Plaintiff's business was identified by a sign hung on an otherwise non-descript fence.  The Defendants' business, on the other hand, occupied a parcel readily accessible and clearly visible from North Pagosa Blvd.  To attempt to cure this situation, in November 2008, Mr. Simmons, the Plaintiff's principal, acquired a parcel adjacent to his business (and abutting North Pagosa Blvd.) to use as a parking lot and added a more conspicuous sign.  As a result, he testified, that although the extent of initial confusion between the businesses was "monstrous," the efforts he undertook to increase the visibility of and ease of customer access to his business "definitely reduced some of the confusion."[8]

---

[7]Mr. Simmons acknowledged in his testimony that, until November 2008, it was "challenging – not impossible, but challenging" for customers to access his location.  Although the business has a mailing address of "North Pagosa Blvd.," to access the property, one would drive along North Pagosa Blvd., turn onto Bastille Drive, turn into an alleyway between two other parcels, and travel a few hundred feet down that alleyway to reach the Plaintiff's door. For customers traveling to the business from Highway 160, the main artery through Pagosa Springs, this route required them to pass directly by the Defendants' readily-accessible business.

[8] Mr. Simmons testified that some confusion still persists.  Unfortunately, the evidence presented does not readily differentiate between instances of confusion that predated the Plaintiff's acquisition of the parking lot and those that post-dated it.  Some witnesses who testified about incidents of confusion sometimes noted, directly or inferentially, that the confusion arose prior to November 2008.  For example, of the three specific incidents in which others complained to her about confusing the two businesses, Ms. Coulihan pointed out that two of the three incidents occurred before the Plaintiff acquired the parking lot.

The reduction in confusion following the Plaintiff's remedial measures in November 2008 is verified by other evidence in the record.  The Plaintiff introduced several volumes of "shift logs," notebooks used by the Plaintiff's employees to record contemporaneous notes about the business' operations, including, among other things, instances in which customers reported confusion with the Defendants' business.  The Plaintiff admitted three exhibits' worth of shift logs, Exhibits 35, 70, and 71, each containing several entries reflecting incidents of customer confusion.  Nearly every entry in each of the three exhibits predates the Plaintiff's November 2008 purchase of the parking lot and erection of a more visible sign.  Only Exhibit 71 includes entries occurring after November 2008, and of the more than 40 entries in that log referring to customer confusion, only 5 entries are dated or after November 2008, with the last one being on January 12, 2009.

Other evidence suggests that although there certainly was – and continues to be – confusion between the two entities, it is not correlated directly to similarity in the business' names.  Mr. Simmons testified about instances in 2009 and 2010 (*i.e.* after the Plaintiff increased its visibility and access) when the Defendants' business distributed cups at a St. Patrick's Day parade.  The cups entitled the bearer to a free drink at the Defendants' establishment.  Mr. Simmons testified that a "large number" of customers mistakenly presented the cups at the Plaintiff's business instead.  A review of Exhibit 82, a photo of one of the cups, makes clear that confusion over the business' names cannot possibly be the explanation for the customers' confusion, because the name on the cups is not particularly similar to Plaintiff's mark.  The Plaintiff's theory of the case is that the Defendants' marks infringe on its mark because both  use

the terms "Pagosa" <u>and</u> some derivation of "brew."[5]  However, the text on the cups does not contain both elements; it reads "Pagosa Pub Works, 165 N. Pagosa Blvd."

These observations suggest that customer confusion between the two business stems, in some substantial part, from the more mundane fact that the businesses are geographically close, that they compete in the same field (food and drink service), and that they have chosen to specialize in similar niches (microbrewed beer).  Such similarities in the parties' businesses might suggest that the marks should be more distinct to help customers overcome such similarities, but it is not clear that even with more distinct marks, the current confusion can be significantly reduced or eliminated.  Indeed, an injunction that required the Defendants to abandon the "Brewpub" portion of its mark, allowing it to trade only under the mark "Pagosa Pub Works," would not have alleviated the confusion created with the St. Patrick's Day cups.[6]

Thus, although the Court accepts as fact the jury's determination in the verdict that similarities in the two marks are "likely to cause confusion among ordinary purchasers,"[7] for purposes of determining whether injunctive relief should be awarded, the Court finds that the

---

[5]As discussed below, the Court has gave doubts that the Plaintiff could assert a viable claim for trademark infringement if the only word common to both marks was "Pagosa."

[6]Indeed, one can readily envision the same result occurring even if the Defendants were to rebrand themselves as (and distribute cups offering free drinks at) "Pagosa Tap House" or "Pagosa Ale Yard," or any other similar mark that (i) relies upon the geographically-descriptive word "Pagosa," and (ii) accompanies that with words that draw a connection to the notion of beer, but avoids the euphony with the Plaintiff's mark of using a derivation of the word "brew."  This underscores that it is the similarity in <u>businesses</u>, not necessarily similarities in <u>marks</u>, that are causing the customer confusion here.

[7]The Court notes that the jury's verdict was not localized in time – *i.e.* it is not clear whether the jury was finding a likelihood of confusion from the marks based on their use under the circumstances as they existed prior to November 2008, or the circumstances existing after November 2008 (or both).  The jury was not asked to opine, and thus, its verdict cannot necessarily be read as opining, as to the degree of confusion likely to exist in the future.

likelihood of customer confusion attributable to the marks – and thus, future irreparable injury to the Plaintiff – is a small relative to the confusion created by the similarity in business and location.  Thus, the benefit of equitable relief is correspondingly small.

> 2. <u>Adequate remedy at law</u>

The second element of equitable relief – the ability of the Plaintiff to obtain an adequate remedy at law – is somewhat related to the preceding discussion. A party has an adequate remedy at law where it is possible to have a jury determine the question of liability and the extent of the injury and remedy the wrong by granting an award of damages. *Haynes Trane Service Agency, Inc. v. American Standard, Inc.*, 573 F.3d 947, 964 (10th Cir. 2009).  There are two conceivable ways in which customer confusion over the two businesses may play out: (i) customers intending to patronize the Plaintiff instead mistakenly patronize the Defendants, and (ii) customers intending to patronize the Defendants mistakenly visit the Plaintiff.

In the latter case – where the Plaintiff is the beneficiary of a confused customer - it is hard to find any injury to remedy.  The Plaintiff has enjoyed the opportunity to make a sale and gain the loyalty of a new customer.  However, if as the evidence shows, customers who dined with the Plaintiff presented coupons or vouchers requiring a reduction in the price of the food or drink served, there is a monetary loss.  This loss, however, is easily calculated.  Indeed, the jury apparently awarded damages for this loss. Thus, there can be little dispute that an adequate remedy at law exists in such circumstances, as the jury's award of damages makes clear.

The former case – where the Plaintiff is injured because <u>its</u> customers mistakenly go to the Defendants' business – presents the more difficult case.  It is impossible to quantify and redress the loss of sales, goodwill, and reputation that result from such a diversion. The customer

who is happy with his or her experience at the Defendant's establishment may return there, depriving the Plaintiff of both the initial sale and repeat business. And a customer who is dissatisfied[8]  with his or her experience at the Defendants' business may attribute it to the Plaintiff.  Such losses are not capable of quantification by a jury, and thus, would fall within the category of injuries for which the Plaintiff lacks an adequate remedy at law.

However, harkening back to the degree of injury, it is difficult to ascertain the frequency with which this now occurs and whether the initial confusion is attributed to the mark or other factors. Thus, although there is a group of hypothetical injuries for which an award of damages provides no adequate remedy, such injuries constitute a relatively small subset of the total instances of customer confusion.

### 3.  Public Interest

The Court bypasses the third enumerated element of equitable relief (balancing of the equities) for the moment and moves on to the final one – the public interest.  The public interest sought to be vindicated in such circumstances is the public interest in avoiding customer confusion based on infringing marks and the public interest in protecting the property interests of holders of protectible marks. *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006).

This factor tips in favor of equitable relief, but only to a limited degree.  There is a public interest in protecting a party from customer confusion resulting from an <u>infringing mark,</u> but, as

---

[8]The Court emphasizes that this dissatisfaction is hypothetical only.  The Plaintiff went to some effort to denigrate the quality of the Defendants' products and services compared to its own, but the Court makes clear that it is not required to credit or discredit such allegations in order to resolve the issues presented here.

discussed below, there also is a public interest in protecting a party's interests in the use of a non-infringing mark. To the extent that customer confusion arises from matters beyond the scope of competing marks – geographic proximity, competition in a particular market niche, etc. – the public interest is not necessarily served by equitable relief necessitating a change in such marks.

4. Balance of Equities

With three factors tipping, slightly to moderately, in favor of granting equitable relief, the Court turns to the final factor: whether the balance of the equities as between the parties favors such relief. The Court has several observations on this point.

First, the Court observes that the Defendants have never sought a ruling on the legal sufficiency of the Plaintiff's trademark infringement claim, either prior to trial[9] or by means of a motion pursuant to Fed. R. Civ. P. 50. This is unfortunate, as it appears to the Court that there is some basis to question whether the trademark infringement claim could have survived such a challenge.

The Plaintiff's mark, "Pagosa Brewing Company," is a composite word mark that is entirely descriptive. The touchstone of the mark is the geographically-descriptive word "Pagosa"; the remaining phrase, "Brewing Company" is merely generic. *See e.g. Boston Duck Tours, LP v. Super Duck Tours, LLC*, 531 F.3d 1, 13-14 (1st Cir. 2008) (suggesting that generic terms answer the question "what are you?" rather than "where do you come from?"). Although geographically-descriptive marks can acquire trademark protection if they have obtained

---

[9]The parties filed numerous pre-trial dispositive motions, but none addressed the Plaintiff's trademark infringement claim on its merits.

secondary meaning (as the jury found the Plaintiff's mark had[10]), that protection does not prevent

others from continuing to make use of the geographic term in their own marks for the term's

descriptive (*i.e.* geographic) meanings. *KP Permanent Make-Up, Inc. v. Lasting Impression I,*

*Inc.*, 543 U.S. 111, 122 (2004), *cited in Vail Associates, Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853,

866 (10th Cir. 2008); *see also Forschner Group, Inc. v. Arrow Trading Co.*, 30 F.3d 348, 353 (2d

Cir. 1994) (the Lanham Act can "protect a geographically descriptive term . . . against other

producers <u>who did not manufacture their goods in said area</u> but nevertheless used the

geographical designation in their name or label") (emphasis added).  Here, the Defendants use

---

[10]The Court also has some doubt that, as a matter of law, the evidence was sufficient to establish that the Plaintiff's mark had acquired a secondary meaning.  For a geographically-descriptive mark to acquire secondary meaning, the public must cease to view the geographic portion of the mark as denoting a <u>place</u>, and instead come to understand that geographic term as identifying an <u>entity</u>.  *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 340 (4th Cir. 2009) (giving examples of "KENTUCKY fried chicken" and "AMERICAN airlines" that "are geographically descriptive marks that have established secondary meanings in consumer's minds, causing consumers to recognize a brand or source of fried chicken or air travel, rather than the places, Kentucky and America").

Much of the Plaintiff's evidence in support of its contention that its mark had acquired a secondary meaning consisted of the fact that the Plaintiff's beer had won awards and recognition at various beer festivals.  This might be sufficient to demonstrate that persons procuring the Plaintiff's beer from, say, a crowded beer aisle in a far-flung supermarket might view the term "Pagosa" in the Plaintiff's mark as descriptive of an particular award-winning entity, not as a location.  But the same logic does not follow with regard to the relevant market here – consumers visiting restaurants in Pagosa Springs, Colorado.  There was no evidence to suggest that, say, tourists in the town, looking for a meal or a drink and having been recommended to try the Plaintiff's business, considered the term "Pagosa" in the Plaintiff's mark to refer to anything other than the geographic location of the business. *Boston Beer Co. v. Slesar Bros. Brewing Co.*, 9 F.3d 175, 181-82 (1st Cir. 1993) ("secondary meaning [in a geographic term] cannot be recognized where, despite a degree of association between the mark and the producer, the original meaning remains dominant; so long as the mark remains descriptive in its primary significance, subsidiary connotations cannot justify trademark treatment").

Thus, without proof that local customers considered the word "Pagosa" in "Pagosa Brewing Company" to mean "Mr. Simmons' business" rather than "the town of Pagosa Springs," the Plaintiff's term cannot have acquired secondary meaning.  The Court finds very little evidence in the record to suggest that local customers forged such a unique association.

the term "Pagosa" in their mark solely for its geographically-descriptive meaning: that is, to

associate their business with the local community.  Thus, the Lanham Act does not permit the

Plaintiff, even as the holder of a geographically-descriptive mark with secondary meaning, to

prevent the Defendants from using the term "Pagosa" in their own mark for geographic purposes.

*Compare Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983)

("The holder of a protectable descriptive mark has no legal claim to an exclusive right in the

primary, descriptive meaning of the term; consequently, anyone is free to use the term in its

primary, descriptive sense <u>so long as such use does not lead to customer confusion</u> as to the

source of the goods or services") (emphasis added) *with KP Permanent*, 543 U.S. at 116, 121-

23[11] (expressly overruling *Zatarains*, finding "no indication that the statute was meant to deprive

commercial speakers of the ordinary utility of descriptive words [and that if] any confusion

results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that

uses a well known descriptive phrase").

 If the Plaintiff cannot base a trademark claim on the Defendants' descriptive use of the

geographic term "Pagosa," infringement must be shown, if at all, by the other commonality

---

[11]*KP Permanent* involved consideration of the "fair use" defense under the Lanham Act. 15 U.S.C. § 1115(b)(4), which allows a defense to a claim of infringement where the use of the plaintiff's mark "is a use, otherwise than as a mark [and] is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin."  (For example, Pepsi may make use of Coke's mark in an advertisement that "In tests, Coke drinkers preferred the taste of Pepsi."  Here, Pepsi is not using "Coke" as Pepsi's own mark, and is using it fairly to describe Coke's own product.)  The fair use defense in question is not applicable here, both because this dispute concerns a term that the Defendants are using as their own mark, and arguably because the jury's finding of willful infringement prevents a conclusion that the Defendants are using the mark "in good faith."  Nevertheless, cases like *Vail Associates* have extended *KP Permanent*'s reasoning beyond the strict boundaries of the "fair use" defense, and, in any event, the reasoning underlying *KP Permanent* is persuasive in this context as well.

between the two marks: the use of a derivation of the word "brew."  Here, however, both marks'

use of the "brew" variant are generic.  The Plaintiff's mark uses the term "brewing" as part of the

phrase "Brewing Company," a statement of "the genus of which [the Plaintiff's business] is a

species." *Boston Duck Tours,* 531 F.3d at 13-14.  Similarly, the Defendants' use of a variant of

"brew" – "Brewpub" – is also a generic term, describing a business that serves beer that has been

manufactured on the premises.  The Plaintiff cannot dispute that the term "brewpub" is anything

other than nominatve; indeed, the central thrust of the Plaintiff's false advertising claim was a

contention that the term "brewpub" had a specific, circumscribed, meaning, and was not

susceptible to differing interpretations as to what a "brewpub" could be.  *See* Exhibit 52, 90.  For

the same reasons discussed above, the Lanham Act does not operate to preclude persons from

using generic terms, like "brewery/brewpub," even when those terms are found in marks that are

otherwise rendered distinctive by virtue of having secondary meaning.  *KP Permanent,* 543 U.S.

at 122 (the Act tolerates "a certain degree of confusion on the part of consumers [where] an

originally descriptive term was selected to be used as a mark, not to mention the undesirability of

allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing

it first"); *Knights Armament Co. v. Optical Systems Technology, Inc.*, 654 F.3d 1179, 1188 (11th

Cir. 2011) (a generic mark cannot acquire secondary meaning).

Having disassembled the marks, the Court now reassembles them, *Boston Duck Tours*,

531 F.3d at 17 n. 20 (explaining that parsing components of a composite mark as a preliminary

step does not violate anti-dissection rule), only to discover that the whole is no greater than the

sum of its parts.  The Plaintiff's composite mark, consisting of a geographically-descriptive term

and a generic term, enjoys very little protection, particularly against a mark that is making only

descriptive or generic use of the same terms.  The fact that the jury found the Plaintiff's mark to have secondary meaning or that customers are likely to be confused by the two marks does not alter this analysis.  As *KP Permanent* makes clear, the Lanham Act anticipates some degree of customer confusion when even a distinctive mark – *i.e.* one possessing secondary meaning – consists of words that others may (indeed, must) use to fairly describe their own product.

Thus, the Court has grave doubts that, had the Defendants moved for judgment as a matter of law on the trademark infringement claim, the claim would have survived.  The Court emphasizes that the Defendants <u>did not</u> make such a motion at any time during this case, and the Court will not *sua sponte* set aside the verdict now.  But the Court refuses to invoke its discretion to impose equitable relief in service of a claim whose legal sufficiency is in considerable doubt.

Second, even if the Court were to proceed to balance the equities in this case, it would nevertheless be guided by the jury's verdict with regard to the degree of harm that injunctive relief would be needed to prevent.  The Plaintiff presented a passionate case to the jury, arguing that the Defendants' infringement was the cause of hundreds of thousands of dollars in damages to the Plaintiff, including profits lost by the Plaintiff and ill-gained profits by the Defendants.  The jury's verdict unambiguously rejected the assumptions at the core of this argument – that the customer confusion arising from the Defendants' infringement was of great economic value – and instead found the economic consequences of the infringement over more than three years were a mere $ 82.  Although the Plaintiff's claim of lost profits were intangible, nothing in the jury instructions prevented the jury from making such an award if the jury was otherwise

persuaded of such injuries' existence.[12]   Nevertheless, the jury's verdict clearly rejected the contention that the infringement worked a significant economic harm to the Plaintiff.  This sends a strong signal to the Court that any equitable relief that would be appropriate should be commensurate with that *de minimis* economic consequences the jury found arose from any infringement.

One could argue that it is inappropriate to balance the equities with reference to the economic damages awarded.  Indeed, as noted above, equitable relief is intended to account for those damages that <u>cannot</u> be remedied at law with a damages award.  The Court can conceive of types of cases where injunctive relief is appropriate even though economic losses from infringement are so ephemeral as to evade meaningful proof.  But this is not one of those cases.  The Plaintiff's claim for damages and the injuries for which injunctive relief are sought go hand-in-hand: injunctive relief is claimed to be necessary to prevent the Plaintiff's customers from mistakenly patronizing the Defendants' business, and the Plaintiffs' claim for damages for lost profits and disgorgement – which the jury apparently rejected outright – are based on the fact that the Plaintiff's customers mistakenly patronized the Defendants' business.  Under these circumstances, the jury's verdict is a meaningful signal that any equitable relief the Court would provide should be no more significant than the *de minimis* relief that the jury's verdict provided.  And in these circumstances, *de minimis* equitable relief is consonant with no equitable relief whatsoever.

Third, the Court considers the meaning of the jury's note.  Just before reaching their

---

[12]*See* Instruction 15 (allowing jury to award lost profits), Instruction 14 (requiring proof of loss only "with as much definiteness and accuracy as circumstances may permit").

verdict, the jury sent out a note reading "we are wondering if we can recommend an action *i.e.* name change and/or dollar amount?" The Court responded that the jury was required to confine its findings to answering the questions posed on the verdict form, and shortly thereafter, the jury reached its verdict. One possible interpretation of the note – certainly, the one the Plaintiff would urge – is that the jury felt that a "name change" by the Defendants was its preferred result, and that the Court should honor the jury's intentions by granting injunctive relief to the Plaintiff.

Certainly, this is a plausible interpretation of the jury's note[13], but even so, it is not clear what recommendation for a name change that the jury might have suggested. It is purely speculative to assume that a name change considered by the jury would correspond to the injunction requested by the Plaintiff. Thus the Court declines to read the jury's note to suggest that an injunction should be imposed.

Finally, the Court takes note that the jury, in response to Question 9 of the Verdict Form, found that the Defendants "acted intentionally, knowing that its conduct was infringing."[14] A

---

[13] There are other equally-plausible interpretations that point in different directions. The jury's request might be understood to be only an attempt to define the boundaries of its options, not necessarily to indicate that the jury would unanimously agree upon relief in the form of a name change if that option were available (the use of the term "and/or" in the note certainly suggests that the jury was weighing its options rather than affirmatively stating a conclusion). The note is also susceptible to an understanding that the jury was offering to "recommend" a name change, rather than intending to compel one.

[14] This finding may have been based on evidence that Mr. Schiro, one of the Defendants' principals, sought to register several trademarks, including "Pagosa Brewing Company," with the USPTO in September 2006. Mr. Schiro testified that, when doing so, he was unaware that the Plaintiff had been using that name in commerce since approximately June 2006. (The evidence in the record as to the precise date of first use is somewhat murky.) But the Plaintiff put on evidence that Mr. Schiro was present at an event in mid-2006 in which the Plaintiff was conspicuously doing business under the "Pagosa Brewing Company" name. The jury's finding suggests the jury disbelieved Mr. Schiro on this point.

finding of intentional infringement is something that would normally tip the balance of equities significantly in favor of equitable relief. However, here, neither party had clean hands with regard to the names of the competing businesses.

The evidence suggests that both parties sought to hamper the other with regard to choice of names. Mr. Simmons admitted that when he "heard rumors of the Schiros opening a place called Pagosa Pub Works Brewpub," he set out to acquire web domain names "that are similar to our business that people might get confused with." He noted that the Schiros had already registered the name "Pagosa Pub Works Brewpub," but on or about March 3, 2008, he registered the internet domain "Pagosa Pub Works" (or more accurately, "pagosapubworks.com"). Mr. Simmons also acknowledged that, "for a couple of months," he had the "Pagosa Pub Works" domain name redirect visitors[15] to the Plaintiff's website. The Defendants' business began operation in or about April 2008,[16] and thus, for at least some period of time, Mr. Simmons was able to direct traffic searching for a close variant of the Defendants' business name to his own website. Mr. Simmons further testified that he later deactivated the "Pagosa Pub Works" name, although he acknowledged that he still owns the domain at this time.

Accordingly, the Court finds that the balance of the equities tips strongly against granting injunctive relief; indeed, this factor alone overcomes the cumulative weight of the remaining factors that would favor injunctive relief. As a result, the Court denies the Plaintiff's

---

[15]Mr. Simmons testified, without dispute, that his web traffic logs recorded no visitors whatsoever to the domain pagosapubworks.com. This may account for the jury's verdict on the Defendants' counter/crossclaim – *i.e.* that Mr. Simmons' conduct did not constitute a deceptive trade practice because no customer was actually deceived.

[16]A news article in the record, Exhibit 17, suggests that the Defendants' business was publicly-known to be named "Pagosa Pub Works" as early as March 19, 2008.

motion for entry of a permanent injunction.

**B.  Attorney's fees**

The Plaintiff requests leave to reopen the case to submit a motion for attorney's fees. This is a curious motion, insofar as the Plaintiff specifically requested an opportunity to make such a motion at the time the Court discharged the jury, and the Court advised the Plaintiff that such a motion was governed by the operation of the Federal Rules of Civil Procedure.  Rule 54(b)(2)(B) indicates that such motions are to be filed within 14 days of the entry of judgment, and judgment in this case entered on May 20, 2011.

The Plaintiff's Motion to Alter Judgment, [etc.], is certainly timely as it was filed 11 days after entry of judgment.  But the motion is quite clearly <u>not</u> intended to itself be a substantive motion for attorney's fees, insofar as it states that "Plaintiff should be allowed to file a motion for attorney's fees . . . which further establish[es] Plaintiff's entitlement to its fees."[17]  But the Plaintiff thereafter filed no timely substantive attorney's fee motion.

It is entirely unclear to the Court why the Plaintiff felt the need, during the time period set forth in Rule 54(d)(2)(B), to file a motion seeking <u>leave</u> to file a motion for attorney's fees, rather than simply filing the fee motion itself.  The Plaintiff's motion is not susceptible to an interpretation that it is a request for an extension of time beyond the Rule 54(d)(2)(B) period to file such a motion, as nothing in the motion recites any difficulty that the Plaintiff would have in making a motion within the time frame set by the Rule.  Nor does the Plaintiff provide any explanation as to why leave of the Court to <u>file</u> a motion seeking fees was somehow necessary.

---

[17]Moreover, were the Court to deem the Plaintiff's motion to be a substantive motion for attorney's fees, the motion would not comply with D.C. Colo. L. Civ. R. 54.3, which requires such motions to be supported by appropriate affidavits and certain other materials.

Although 15 U.S.C. § 1117 predicates an award of fees upon the Court making a finding that the case was "exceptional," the Court would expect that a timely fee motion by the Plaintiff would address the exceptional circumstances of the case as part of its argument that a fee award was appropriate.  In the absence of any apparent justification for its failure to file a motion for attorney's fees within the time provided by Rule 54, the Court declines the Plaintiff's request for "leave" to file a now-untimely motion in that regard.[18]  To the extent that the  Plaintiff's Motion to Amend Judgment was intended to be a motion for attorney fees, it is also denied.

### C.  Costs

Finally, the Motion to Amend Judgment, [etc.] requests that the Court reconsider that portion of its prior Order that denied the Plaintiff costs as part of the judgment.  The Court finds that the reasoning in its prior Order remains valid, particularly in light of the additional findings set forth herein.  Accordingly, the request for reconsideration of the denial of costs is denied.

---

[18]In any event, the Court would be disinclined to award  attorney's fees for several reasons.  First, as discussed above, the Court has grave doubts that the trademark infringement claim itself is legally-sufficient at all, much less sufficient to warrant a substantial fee award.  Second, 15 U.S.C. § 1117(a) allows fee awards only in "exceptional" cases.  A case is "exceptional" where the infringement is "malicious, fraudulent, deliberate, or willful."  *Western Diversified Servs., Inc. v. Hyundai Motor America, Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005).  Although the jury found that the Defendants' conduct was "willful," courts have rejected the notion that there is a "*per se* equivalence between 'exceptional case' and a jury's finding of willfulness."  *Visible Systems Corp. v. Unisys Corp.*, 551 F.3d 65, 81 (1st Cir. 2008), *citing Tamko Roofing Products, Inc. v. Ideal Roofing Co.*, 282 F.3d 23, 31 n.5 (1st Cir. 2002) ("Congress gave the attorneys' fees issue to the court, not to the jury, and the court must consider whether an award is equitable").  Here, for the reasons set forth above, the Court finds that the circumstances do not rise to the level of "exceptional" sufficient to permit an award of fees.  Third, the statute permits the Court to award a "reasonable" attorney's fee to a prevailing party, and in light of the *de minimis* award by the jury and the Court's refusal to award additional equitable relief, even if the Court were inclined to permit an award of fees, the Court would be inclined to find that the only "reasonable" fee is no fee whatsoever.  *See e.g. Farrar v. Hobby*, 506 U.S. 103, 115 (1992).

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Reopen Case (#**219**), the Motion to Alter Judgment, [etc.] **(# 220)**, and Motion for Permanent Injunction **(# 221)** are **DENIED**.

Dated this 29th day of March, 2012

BY THE COURT:

Marcia S. Krieger
United States District Judge